# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

JORDAN ASHLEY WALLER,      )
           )
    Plaintiff,          )
           )
    v.             )    Case No. 7:23-cv-00170-LCB-NAD
           )
CAPTAIN CARTER, et al.,      )
           )
    Defendants.        )

## REPORT AND RECOMMENDATION

Plaintiff Jordan Ashley Waller filed an amended *pro se* complaint pursuant to 42 U.S.C. § 1983, alleging violations of his Eighth Amendment rights while incarcerated at the Bibb Correctional Facility.  Doc. 6.  In his amended complaint, Plaintiff Waller names the following Defendants:  Captain Ronald Carter, Warden Christopher Gordy, and Correctional Officer Ryan Provost.[1]  Doc. 6 at 1–3; *see* Doc. 18 at 2.

Waller alleges that on September 30, 2022, each Defendant used excessive force against him over the course of three separate but related incidents.  Doc. 6 at 4–5.  Waller seeks money damages for his alleged injuries.  Doc. 6 at 7.

Consistent with the usual practices of this court, this matter was referred for a

---

[1] Waller identifies Provost as "Robert" (Doc. 6 at 2), but Defendants' special report identifies him as "Ryan" (Doc. 18 at 2).

1

preliminary report and recommendation.  *See* 28 U.S.C. § 636(b)(1); *McCarthy v. Bronson*, 500 U.S. 136 (1991); N.D. Ala. Local Rule 72.1.  For the reasons stated below, this report recommends that the court deny Defendants' motion for summary judgment (Doc. 18).

## BACKGROUND

### A.      Factual background

#### 1.      Waller's sworn allegations

In his sworn allegations, Waller alleges the following:  On September 30, 2022, between 8:30 am and 9:30 am, Waller attended breakfast in the dining hall.  Doc. 6 at 4, 7.  When Waller received his meal tray, Gordy handed him a pint-sized carton of milk.  Doc. 6 at 4.  After receiving his milk from Gordy, Waller picked up a second milk carton that another inmate had left on the counter.  Doc. 6 at 4; *see* Doc. 1 at 1.

Carter and Gordy then surrounded Waller.  Doc. 6 at 4.  Carter took Waller's meal tray away from him, after which Carter "forced [Waller] against the wall and then the Warden [Gordy] slammed [Waller's] head against the wall by hitting [him] in the forehead."  Doc. 6 at 4; *see* Doc. 22 at 2.  Waller's hands then were "restrained behind [his] back," and he was escorted out of the dining hall.  Doc. 6 at 4.

After Waller was escorted out of the dining hall, Carter "pushed [Waller] face first up against the first exit gate fence," causing fence wire to pierce Waller's nose.

2

Doc. 6 at 4.  In the process, and in Gordy's view, Waller's "shoes were knocked off [his] feet."  Doc. 6 at 4.  Carter retrieved Waller's shoes, and "slapped [him] in the face with them."  Doc. 6 at 4.  Waller then was told to return to his dorm unescorted.  Doc. 6 at 4.

While Waller was returning to his dorm, non-party Captain Webster instructed Waller to report to the shift office.  Doc. 6 at 4.  At about the same time, Provost instructed Waller to come to him; Waller decided to follow Webster's instructions instead of Provost's.  Doc. 6 at 4.  Provost then grabbed Waller, and hit him in the back of the head with his metal baton.  Doc. 6 at 4, 7.  Waller began bleeding from a wound in the back of his head.  Doc. 6 at 4–5.  Webster then instructed Waller to go to the healthcare unit.  Doc. 6 at 5.

At the healthcare unit, Waller received eight stitches in his head, a body chart, and updates to his medical file.  Doc. 6 at 5; *see* Doc. 1 at 1.  Non-party Sergeant White took pictures of Waller's injuries.  Doc. 6 at 5.

### 2.    Defendants' sworn factual responses

In his sworn affidavit, Gordy avers as follows:  On September 30, 2022, he was providing security in the dining hall.  Doc. 18-1 at 2.  When Waller picked up two milk cartons, Gordy instructed Waller to put one back.  Doc. 18-1 at 2.  Waller ignored Gordy and began walking away.  Doc. 18-1 at 2.  Gordy gave Waller a direct order to stop.  Doc. 18-1 at 2.  Carter approached and ordered Waller to stop and

3

return to the serving line.  Doc. 18-1 at 2.  Carter then told Waller to face the wall, and Waller complied.  Doc. 18-1 at 2.  Gordy removed both milk cartons from Waller's tray, and instructed Waller to leave the dining hall.  Doc. 18-1 at 2.  Carter escorted Waller out of the dining hill, and Gordy returned to the serving line.  Doc. 18-1 at 2.  Neither Gordy nor Carter used force against Waller in the dining hall.  Doc. 18-1 at 2.

With respect to the alleged incident in the dining hall, Carter's sworn affidavit is substantially similar to Gordy's.  *See* Doc. 18-2 at 2.  Carter avers that he was providing security at the exit door of the dining hall, and witnessed Waller become "irate and noncompliant with direct orders" from Gordy to return one carton of milk to the counter.  Doc. 18-2 at 2.  Waller's "noncompliance prompted Carter to intervene and stop inmate Waller"; Carter ordered Waller back to the serving line and performed a pat down search on him.  Doc. 18-2 at 2.

In his sworn affidavit, Carter also avers that, while he was escorting Waller out of the dining hall, Waller attempted to turn around and reenter the dining hall through the exit door.  Doc. 18-2 at 2.  Carter "maintained positive control of inmate Waller," and Waller was not able to reenter the dining hall.  Doc. 18-2 at 2.  Instead, Waller "proceeded down the side walk to return to his assigned living area."  Doc. 18-2 at 2.  Neither Gordy nor Carter used any force against Waller.  Doc. 18-2 at 2.

In his sworn affidavit, Provost avers that he ordered Waller to return to his

4

dorm, but Waller refused to comply with the order.  Doc. 18-4 at 1.  Provost placed a hand on Waller's shoulder, but Waller "snatched away" and stated, "I got something for you."  Doc. 18-4 at 1.  Provost then ordered Waller to place his hands behind his back to be restrained, but Waller failed to comply.[2]  Doc. 18-4 at 1.  Provost avers that he pulled his baton because he felt threatened by Waller's "statement and non-compliant behavior."  Doc. 18-4 at 1.  When Provost attempted a baton strike on Waller to gain compliance, Waller attempted to avoid the strike, resulting in Waller being hit in the head area.  Doc. 18-4 at 1–2.  Non-party correctional officers Hutton and Webster then arrived and escorted Waller to the healthcare unit.  Doc. 18-4 at 2.

### 3.  Documentary evidence submitted by Defendants

According to an incident report dated September 30, 2022, non-party Captain Hutton observed Provost escorting Waller from the dining hall back door area.  Doc. 18-3 at 1.  As Provost and Waller approached the sidewalk, Hutton saw Provost remove his baton and strike Waller one time in the back of the head.  Doc. 18-3 at 1.  Captains Hutton and Webster took Waller to the healthcare unit.  Doc. 18-3 at 1.  When Hutton questioned Provost about the incident, Provost responded that Waller was "acting irate," refused to return to his dorm, and instead attempted to walk

---

[2] According to Waller's sworn allegations, Waller already was restrained with his hands behind him at this time.  *See* Doc. 6 at 4.

toward the shift office.  Doc. 18-3 at 1.  Provost placed his hand on Waller's shoulder and again ordered him to return to his dorm.  Doc. 18-3 at 1.  Waller "snatched away from Officer [P]rovost's grasp, and stated 'I got something for you.'"  Doc. 18-3 at 1.  Provost then struck Waller in the head with his baton.  Doc. 18-3 at 1.  According to the incident report, Waller received a "jagged wound" on the back of his head but had no other injuries.  Doc. 18-3 at 1.

The body chart completed for Waller indicates he told the nurse that he "got hit with a stick."  Doc. 18-5 at 1.  The nurse noted a "[j]agged wound to back of left side of head.  Redness to forehead & [right] side of neck."[3]  Doc. 18-5 at 1.

An inmate statement by Waller dated September 30, 2022, states that Waller wanted to talk to Captain Webster, but Provost told him to return to his dorm.  Doc. 18-6 at 1.  When Waller refused, Provost "grabbed [him] and hit [him] with the extension stick still closed."  Doc. 18-6 at 1.  Waller also stated that he did not get to eat.  Doc. 18-6 at 1.

The Alabama Department of Corrections (ADOC) conducted a use of force investigation.  *See* Doc. 18-7; Doc. 18-9.  On review by Hutton, Provost's use of force was found to be "not reasonable" because Waller "posed no threat" at the time the force was used.[4]  Doc. 18-7 at 1.  On further review, Review Officer Joanne

---

[3] Waller's body chart did not document any injury to his nose.  *See* Doc. 18-5 at 1.

[4] This report states that, after Provost hit Waller, "Waller was placed in handcuffs

Jones agreed with the "unjustified" finding. Doc. 18-8 at 1; Doc. 18-9 at 1. The ADOC then assigned Review Officer Suzanne Hamm to conduct an independent review. Doc. 18-9 at 1.

Hamm spoke with Waller, who provided similar facts to those alleged in his amended complaint. *See* Doc. 18-9 at 2. Waller explained that he was going through the "chow line" and took an extra milk carton. Doc. 18-9 at 2. Carter grabbed him and "slammed" him against the wall. Doc. 18-9 at 2. Next, Gordy "slammed Inmate Waller's head against the wall." Doc. 18-9 at 2. Carter then handcuffed him, escorted him outside, and "slammed [Waller's] face into the fence, and told him to go back to his dorm." Doc. 18-9 at 2. Waller said he had a hole in his nose from the fence, but no mark or scar was visible to Hamm. Doc. 18-9 at 2.

Waller told Hamm that he was returning to his dorm when Webster called to him to ask what was happening. Doc. 18-9 at 2. At the same time, Provost called to Waller, but Waller went toward Webster since he outranked Provost. Doc. 18-9 at 2. Waller told Hamm that, when he got to Webster, Provost came up behind him, "slammed [him] to the floor," picked him back up, and then struck him in the back of the head with his baton. Doc. 18-9 at 2.

Hamm also spoke with Provost, who said that he was escorting Waller back to his dorm when Waller stated, "he was not going anywhere, and that he was going

---

and escorted to the healthcare [unit] . . . ." Doc. 18-7.

7

to eat." Doc. 18-9 at 2. Provost directed Waller toward his dorm, but Waller refused to go. Doc. 18-9 at 2. Hamm determined that Waller's actions constituted "passive resistance." Doc. 18-9 at 2. When Waller then "snatched away" from Provost and stated, "I got something for you," Waller engaged in "aggressive resistance." Doc. 18-9 at 2. According to Hamm's report, Provost told Waller to stop for a "pat search," but Waller responded that Provost "was not going to touch him." Doc. 18-9 at 3. Because Waller refused to comply, Provost attempted to strike Waller across his upper arm. Doc. 18-9 at 3. Waller turned, causing Provost to strike him on the back and head. Doc. 18-9 at 3. Provost said that he did not intend for the baton to hit Waller's head. Doc. 18-9 at 3.

Hamm spoke with Gordy, who told Hamm that the incident in the dining hall occurred during an inmate "work stoppage," in which inmates refused to perform their assigned jobs. Doc. 18-9 at 3. Gordy stated that there were probably hundreds of inmates who were put out of the kitchen for attempting to eat twice or get extra milk cartons. Doc. 18-9 at 3. Gordy denied using force against any inmate during this time. Doc. 18-9 at 3.

Hamm spoke with Carter, who stated that he was working in the dining hall, controlling inmate traffic to prevent them from entering twice. Doc. 18-9 at 3–4. Carter remembered Gordy confronting Waller about getting in line a second time. Doc. 18-9 at 4. Carter explained that the dining hall was a high stress environment

8

because inmates were shouting derogatory remarks. Doc. 18-9 at 4. Carter said that Waller was cursing and shouting at Gordy after Gordy told him to leave, and that Waller refused to leave and continued to aggressively challenge Gordy. Doc. 18-9 at 4. Carter said he escorted Waller out of the dining hall. Doc. 18-9 at 4. Carter said he did not handcuff Waller and had no further interaction with him. Doc. 18-9 at 4. Carter said that he did not carry handcuffs or any tools used for inmate compliance on his person. Doc. 18-9 at 4.

Hamm spoke with Webster, who said that he was in the shift office when he heard a commotion and responded to where Provost and Waller were. Doc. 18-9 at 3. Webster denied ever calling to Waller, and denied seeing anything that occurred between Provost and Waller. Doc. 18-9 at 3. Webster said he did not ask Provost why he struck Waller, but escorted Waller to the healthcare unit. Doc. 18-9 at 3.

Hamm spoke to Hutton, who told Hamm that he was facing the shift office when he heard yelling. Doc. 18-9 at 3. Hutton said he turned around and saw Waller with his arm raised and turning away from Provost, as Provost struck Waller with his baton. Doc. 18-9 at 3. Hutton said he sent Webster to separate Provost and Waller. Doc. 18-9 at 3.

Hamm concluded from her investigation that Provost's use of force was "lawful, and proper and therefore considered Justified," because Waller was "agitated and non-compliant with Warden Gordy's orders to leave the chow hall,"

9

had to be "physically removed from the chow hall by Captain Carter," refused to return to his dorm as directed, and refused to "stop for a pat down search." Doc. 18-9 at 4.

### B.    Legal background

#### 1.    Excessive force under the Eighth Amendment

Under the Eighth Amendment,[5] "the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)) (quotation marks omitted). "What is necessary to establish an 'unnecessary and wanton infliction of pain' . . . varies according to the nature of the alleged constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting *Whitley*, 475 U.S. at 320).

In the context of a custodial excessive force claim, "corrections officers must balance the need 'to maintain or restore discipline' through force against the risk of injury to inmates." *Hudson*, 503 U.S. at 6 (citations omitted). And, "officials confronted with a prison disturbance must balance the threat unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if

---

[5] *See, e.g.*, *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 764 & n.12 (2010); *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019) (stating that, with a few exceptions, the United States Supreme Court "has held that the Fourteenth Amendment's Due Process Clause incorporates the protections contained in the Bill of Rights, rendering them applicable to the States").

guards use force." *Id.*

For instance, the use of force generally is justified where it is "necessary to restore order." *See, e.g.*, *Williams v. Radford*, 64 F.4th 1185, 1197 (11th Cir. 2023) (citing *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990)); *accord Pearson v. Taylor*, 665 F. App'x 858, 864 (11th Cir. 2016) ("In general, prison officials are authorized to use force when a prisoner repeatedly fails to obey an order . . . Officers are not required to convince every prisoner that their orders are reasonable . . . before resorting to force." (citations omitted)).

Regardless, on a custodial excessive force claim, "whenever prison officials stand accused of using excessive physical force," the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6–7; *see also Sears v. Roberts*, 922 F.3d 1199, 1205 (11th Cir. 2019) (similar).

The United States Supreme Court has articulated factors for "determining whether the use of force" in the custodial context "was wanton and unnecessary." *Hudson*, 503 U.S. at 7; *see also Whitley*, 475 U.S. at 319 ("the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment"). Those factors (commonly referred to as the *Whitley* factors) include "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made

11

to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321).

Also, "the extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation, 'or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321). "The extent of injury may also provide some indication of the amount of force applied." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). So, "[t]he absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Hudson*, 503 U.S. at 7.

In addition, the Supreme Court has instructed that "courts considering a prisoner's claim must ask both if 'the officials act[ed] with a sufficiently culpable state of mind' and if the *alleged wrongdoing* was objectively 'harmful enough' to establish a constitutional violation." *Hudson*, 503 U.S. at 8 (citation and quotation marks omitted; alteration in original; emphasis added). In this regard, the Supreme Court has referred to a "subjective" and "objective" component of a custodial excessive force claim. *Id.* ("the subjective aspect of an Eighth Amendment claim . . . can be distinguished from the objective facet of the same claim").

For the subjective component, analyzed under the *Whitley* factors, a court should be mindful of the prison officials' point of view based on the facts known at

the time, and should "give a wide range of deference to prison officials acting to preserve discipline and security." *Sears*, 922 F.3d at 1205 (citing *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007)).  A court should recognize that "corrections officials must make their decisions in haste, under pressure, and frequently without the luxury of a second chance" (*Hudson*, 503 U.S. at 6 (citations omitted)), but that deference "does not insulate from review actions taken in bad faith or for no legitimate purpose" (*Whitley*, 475 U.S. at 322).

For the objective component, not "every malevolent touch by a prison guard gives rise to a federal cause of action."  *Hudson*, 503 U.S. at 9 (citation omitted).  "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  *Hudson*, 503 U.S. at 9–10 (citations and quotation marks omitted); *see Wilkins*, 559 U.S. at 38 ("An inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim." (citations and quotation marks omitted)).

But, regardless "whether or not significant injury is evident," "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated."  *Hudson*, 503 U.S. at 9 (citing *Whitley*, 475 U.S. at 327).  "Otherwise, the Eighth Amendment would permit any physical

13

punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Id.*

As the Supreme Court has explained, "[i]njury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts." *Wilkins*, 559 U.S. at 38. "An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Id.*

### 2. Qualified immunity

Qualified immunity protects government officials performing discretionary functions "from liability for civil  damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Saunders v. Duke*, 766 F.3d 1262, 1266 (11th Cir. 2014) (quoting *Lane v. Franks*, 573 U.S. 228, 243 (2014)). In order to receive the protection of qualified immunity, a government official first must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004).

To overcome qualified immunity, a plaintiff then must show (1) that the

official violated a constitutional right, and (2) that the right was clearly established at the time of the alleged violation. *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019). A court may address these two prongs "in either order." *Waldron v. Spicher*, 954 F.3d 1297, 1304 (11th Cir. 2020).

For a right to be clearly established, a plaintiff can either identify case precedents with materially similar facts or show that the violation was so obvious that every reasonable officer would know that his actions were unconstitutional. *Corbitt v. Vickers*, 929 F.3d 1304, 1311–12 (11th Cir. 2019). In other words, the law must give the officer "fair warning" that his conduct is unconstitutional. *Piazza v. Jefferson Cty., Ala.*, 923 F.3d 947, 955 (11th Cir. 2019) (citations omitted). In analyzing qualified immunity, courts focus not only on the state of the law, but on the factual information that the defendant possessed at the time of the alleged violation. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (stating that the qualified immunity analysis "will often require examination of the information possessed by" the defendant official).

### C. Procedural background

On February 10, 2023, Waller initiated this action by filing a *pro se* affidavit that was construed as a § 1983 complaint. Doc. 1. In response to a notice of deficient pleading (Doc. 5), Waller filed this *pro se* amended complaint (Doc. 6).

In response to an order for special report (Doc. 11), Defendants filed a special

report, supported by affidavits and other evidence.  Doc. 18.  In the special report, Defendants argue that Waller has not established that any Defendant used excessive force against Waller, and that Carter and Gordy are not vicariously liable as supervisors.  Doc. 18 at 10–16.

On November 1, 2023, the parties were notified that the court would construe the special report as a summary judgment motion, and Waller was notified that he had 21 days to respond to the summary judgment motion by filing affidavits or other materials.  Doc. 20.  Waller was advised of the consequences of any failure to respond or to comply with Federal Rule of Civil Procedure 56.  Doc. 20; *see Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).

On November 9, 2023, Waller filed a sworn response, supported by evidence.  Doc. 22.  In his response, Waller points to the findings by Hutton and Jones that Provost's use of force was unjustified.  Doc. 22 at 1.

## LEGAL STANDARD

Summary judgment is appropriate when the movant establishes that "there is no genuine dispute as to any material fact," and that the movant "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A material fact is one that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute about a material fact is "genuine," if "the evidence is such that a reasonable jury

16

could return a verdict for the nonmoving party." *Id.*

To avoid summary judgment, the nonmovant must go beyond the allegations to offer specific facts that create a genuine dispute for trial. *Celotex*, 477 U.S. at 324–25. The court's job is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The court must construe all evidence and draw all reasonable inferences in favor of the nonmovant. *Centurion Air Cargo, Inc. v. UPS Co.*, 420 F.3d 1146, 1149 (11th Cir. 2005).

Where there is no genuine dispute of material fact for trial, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c).

In addition, when ruling on a defendant's summary judgment motion, the court must consider any "specific facts" that a *pro se* plaintiff pleaded in his sworn complaint. *See Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). The court liberally construes a *pro se* pleading. *See, e.g.*, *Jones v. Florida Parole Comm'n*, 787 F.3d 1105, 1107 (11th Cir. 2015) (the court should hold a *pro se* pleading to "a less stringent standard than a pleading drafted by an attorney").

Furthermore, the practical reality that a plaintiff's "evidence consists mainly of his own testimony in his verified complaint, sworn response, and sworn affidavit does not preclude a finding that a genuine dispute of material fact exists." *Sears*,

17

922 F.3d at 1208.  And, "[e]ven if his sworn statements turn out to be exaggerations or false, they are enough to raise a genuine issue of material fact" for trial.  *Id.* at 1209.  When ruling on a summary judgment motion, a court cannot make credibility determinations.  *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006).

## DISCUSSION

The court should deny Defendants' summary judgment motion (Doc. 18) because there are genuine issues of material fact on Waller's excessive force claims against Defendants in their individual capacities only.[6]

**A.**      On Waller's excessive force claims against Carter, Gordy, and Provost, there are triable issues of fact on whether each Defendant violated Waller's Eighth Amendment rights.  Construing all of the evidence and reasonable inferences in Waller's favor, the court cannot say—as a matter of law—"whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson*, 503 U.S. at 7.

---

[6] While Waller names each Defendant in his official and individual capacity, sovereign immunity bars any official capacity claims. *See Pennhurst State Sch. & Hosp. v Halderman*, 465 U.S. 89, 100 (1984); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (a suit against a state official in his official capacity is a suit against the state itself); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (the Eleventh Amendment prohibits a suit against the state absent the state's consent to the suit). Consequently, the court should construe Waller's claims as against each Defendant in his individual capacity only. *See Chandler v. Vansuch*, 2022 WL 1721220, at *2–3 (N.D. Fla. April 6, 2022) (a court must consider the appropriate capacity for a claim against a defendant, regardless of a *pro se* prisoner's designation).

18

The parties do not dispute that, when Waller went to the dining hall on September 30, 2022, he took an extra milk carton, and he then did not comply with at least some instructions from Defendants. *See, e.g.*, Doc. 6 at 4; Doc. 18-1 at 2. The parties also do not dispute the Provost hit Waller in the head with his baton, causing a wound. *See* Doc. 6 at 4; Doc. 18-4 at 1–2.

Nevertheless, there are genuine disputes of material fact about whether Defendants acted in good faith to restore order based on Waller's noncompliance, or whether they acted maliciously and/or sadistically to harm Waller. *See Hudson*, 503 U.S. at 7. Waller alleges, over the course of the three alleged incidents, that Gordy "slammed [Waller's] head against the wall by hitting [him] in the forehead," that Carter "pushed [Waller] face first" against a fence and then "slapped" Waller in the face with Waller's shoes, and that Provost grabbed Waller and hit him in the back of the head with a metal baton. Doc. 6 at 4. Waller also alleges that, during the incidents outside of the dining hall, his hands were restrained behind his back. Doc. 6 at 4.

On the other hand, Defendants aver that Carter and Gordy did not use any force against Waller, and that Provost's use of force was justified; and Defendants have submitted supporting evidence. *See* Doc. 18 at 5–14; Doc. 18-1; Doc. 18-2; Doc. 18-4; Doc. 18-9.

Thus, Waller's sworn allegations (Doc. 6; *see* Doc. 1) and the special report

19

and exhibits from Defendants (*see, e.g.*, Doc. 18; Doc. 18-1; Doc. 18-2; Doc. 18-4) amount to record evidence that "pits the correctional officers' word against an inmate's." *Rivera v. LeBron*, 824 F. App'x 838, 842 (11th Cir. 2020) (citing *Sears*, 922 F.3d at 1208–09); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, [the plaintiff's] sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage. . . . '[C]ourts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.'" (citations omitted)).

Even if Waller's allegations "turn out to be exaggerations or false, they are enough to raise a genuine issue of material fact" for trial. *Sears*, 922 F.3d at 1209. This is "a classic swearing match, which is the stuff of which jury trials are made." *Id.* at 1208. "[W]hen it comes to arguing the merits, [a defendant] should not—may not—rely on his own factual story. Rather, he should—must—accept his opponent's story and convince [the court] that he is nonetheless entitled to prevail as a matter of law." *Patel v. Lanier Cty., Ga.*, 969 F.3d 1173, 1179 n.1 (11th Cir. 2020). Resolving the fact disputes in this case turns on credibility questions, which create issues of fact to be resolved at trial. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (holding that determining which version of the facts is more credible is reserved for a trier of fact, and not a court considering a motion for summary judgment); *Miller*, 458 F.3d at 1256 (holding that, even where a court "believes that

20

the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices").

Here (again), taking as true Waller's sworn allegations, Gordy slammed Waller's head into the wall, Carter pressed his face into a fence that pierced his nose and hit Waller in the face with Waller's shoes, and Provost hit Waller in the back of the head with a baton, all based only on non-violent noncompliance with orders and without legitimate penological purpose. *See* Doc. 6 at 4. With the exception of the wound in Waller's head caused by Provost, Waller may not have sustained major injuries; but the lack of significant injury is not determinative. Particularly given the sworn allegation that Waller was restrained during at least some of the alleged incidents of excessive force, a reasonable trier of fact still could find that the *Whitley* factors weigh in Waller's favor because the alleged severity of the force exceeded the need for the application of such force. *See Hudson*, 503 U.S. at 7 (quoting Whitley, 475 U.S. at 321). And, with respect to Provost, some of the ADOC reviews found that his use of force was unjustified. *See* Doc. 18-7 at 1; Doc. 18-9 at 1.

Moreover, the Supreme Court has emphasized that the "core inquiry" regarding excessive force is not "the extent of the injury," but the "nature of the force—specifically, whether it was nontrivial and was applied maliciously and sadistically to cause harm." *Wilkins*, 559 U.S. at 39 (cleaned up). The Supreme Court has recognized, and the Eleventh Circuit has reiterated, that an "inmate who

21

is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape serious injury." *Williams*, 64 F.4th at 1197 (quoting *Wilkins*, 559 U.S. at 38). Waller sufficiently has alleged, even without evidence of a serious physical injury for every alleged wrongful act by each Defendant, that Carter, Gordy, and Provost maliciously and/or sadistically used nontrivial force against him in bad faith and without legitimate purpose. *See Hudson*, 503 U.S. at 9; *Whitley*, 475 U.S. at 322; *see also Sconiers*, 946 F.3d at 1268 (holding that summary judgment was not appropriate and that the plaintiff potentially could recover nominal damages where the plaintiff averred, without showing any physical injury, that a guard pepper sprayed him and slammed him to the ground without a legitimate penological purpose). A reasonable trier of fact could find that Defendants acted not to restore order, but rather to hurt or humiliate Waller. *See Hudson*, 503 U.S. at 6–7.

At this stage (and given the parties' conflicting versions of the relevant incidents), the court cannot assess the credibility of the parties; that assessment is for a factfinder. *See, e.g.*, *Miller*, 458 F.3d at 1256; *see also Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) ("when conflicts arise between the facts evidenced by the parties," the court must "credit the nonmoving party's version" (emphasis omitted)). As in *Sears*, "[w]e do not know what the true facts are, but we do know that a genuine dispute of material fact exists." 922 F.3d at 1209.

22

**B.**     On Waller's excessive force claims, Defendants are not entitled to qualified immunity because—construing all of the evidence and reasonable inferences in Waller's favor—Waller's Eighth Amendment right was clearly established at the time of the alleged violations. Defendants' special report includes a conclusory assertion, without supporting argument, that Defendants are entitled to qualified immunity. Doc. 18 at 4. The parties do not dispute that Defendants were acting within their discretionary authority at the time of the alleged incidents. *See Kesinger*, 381 F.3d at 1248. And, as discussed above (*see supra*), a reasonable trier of fact could find that Defendants violated Waller's Eighth Amendment rights. *See Harlow*, 457 U.S. at 818. Consequently, the question is whether that right was clearly established at the time of the alleged violations. *See id.*

Here, construing the record evidence and reasonable inferences in Waller's favor, Defendants used unjustified force maliciously and/or sadistically to cause harm to Waller. Defendants had "fair warning" that such alleged conduct is unconstitutional. *See Piazza*, 923 F.3d at 955; *see also Pullen v. Osceola Cty.*, 861 F. App'x 284, 290 (11th Cir. 2021) (holding that the use of force "maliciously and sadistically to cause harm" is a clearly established violation of the Eighth Amendment, and that "[t]here is simply no room for a qualified immunity defense when the plaintiff alleges such a violation" (quoting *Skrtich v. Thorton*, 280 F.3d

23

1295, 1302 (11th Cir. 2002)[7])).

**C.** With respect to Carter and Gordy, Defendants argue that § 1983 does not allow for supervisory liability. *See* Doc. 18 at 14–16. But Waller does not appear to allege or argue that either Carter or Gordy should be held liable for their "subordinates' constitutional violations." *Mathews v. Crosby*, 480 F.3d 1265, 1270 (11th Cir. 2007) (holding that "supervisors can be held liable for subordinates' constitutional violations on the basis of supervisory liability under 42 U.S.C. § 1983" only under certain limited circumstances). Instead, Waller's claims against Carter and Gordy relate to their own alleged wrongful conduct, and not their positions as supervisors. Accordingly, the court need not address Defendants' argument regarding supervisory liability. *See* Doc. 6 at 4.

## RECOMMENDATION

For the reasons stated above, this report **RECOMMENDS** that the court **DENY** Defendants' motion for summary judgment (Doc. 18), as genuine issues of material fact remain for trial on Waller's Eighth Amendment excessive force claims

---

[7] In *Skrtich*, the Eleventh Circuit held that "a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment." *Skrtich*, 280 F.3d at 1301. But multiple district courts in this circuit—including in this district—have noted "significant tension between *Skrtich*'s bright-line rule and Supreme Court precedent on qualified immunity, which may call for a more fact-specific analysis of whether the particular type and extent of force at issue has been 'clearly established' as unconstitutional." *Wilhite v. Parker*, No. 7:20-CV-00847-KOB, 2022 WL 3718502, at *3 (N.D. Ala. Aug. 29, 2022); *see also Stalley v. Cumbie*, 586 F. Supp. 3d 1211, 1227 n.8 (M.D. Fla. 2022).

against Carter, Gordy, and Provost, in their individual capacities only.

In addition, this report **RECOMMENDS** that the court **REFER** back to the undersigned for further proceedings consistent with this report Waller's Eighth Amendment excessive force claims against Carter, Gordy, and Provost, in their individual capacities only.

## NOTICE OF RIGHT TO OBJECT

Any party may file specific written objections to this report and recommendation. Any objections must be filed with the Clerk of Court within **14 days**. The objecting party must identify every objectionable finding of fact and recommendation and state the specific basis for every objection. The objecting party also must identify every claim in the complaint that the report and recommendation has not addressed. Objections should not contain new allegations, present additional evidence, or repeat legal arguments.

A party who fails to object to factual or legal conclusions in the Magistrate Judge's report and recommendation waives the right to challenge on appeal those same conclusions adopted in the District Judge's order. Without a proper objection, however, the court on appeal may review the unobjected-to factual and legal conclusions for plain error if necessary in the interests of justice. 11th Cir. R. 3-1.

After receiving the objections, a District Judge will conduct a de novo review of the relevant portions of the report and recommendation and may accept, reject, or

modify, in whole or in part, the Magistrate Judge's findings of fact and recommendations. The District Judge may refer this action back to the Magistrate Judge with instructions for further proceedings.

A party may not appeal the Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. A party may only appeal from a final judgment entered by a District Judge.

**DONE** this June 27, 2024.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE